15 MJ 7218

15 MJ 7219 SCB

## AFFIDAVIT IN SUPPORT OF ARREST AND SEARCH WARRANTS

I, Daniel J. Fornash, hereby state as follows:

1. I am a Special Agent of the United States Department of the Treasury, Internal Revenue Service ("IRS"), Criminal Investigation ("IRS-CI"), assigned to the Boston, Massachusetts Field Office. I have been so employed since September 15, 2011. My educational background includes a bachelor's degree from Plymouth State University in Business Administration. I graduated from the Federal Law Enforcement Training Center Criminal Investigation Training Program and the National Criminal Investigation Training Academy, located in Glynco, Georgia in December 2011 and March 2012, respectively, and have received extensive training in all aspects of criminal investigation. As a special agent, my duties include the investigation of criminal violations of the Internal Revenue Code, financial crimes, and other related criminal statutes. I have conducted and participated in criminal investigations of tax fraud.

2. I make this affidavit in support of applications for issuance of warrants to arrest Raza Ali ("Ali"), Muhammad Saleem Iqbal ("Iqbal") and Kaleem Ahmad ("Ahmad") for violation of 15 U.S.C. § 376 (Jenkins Act/PACT Act), 18 U.S.C. § 2342 (Contraband Cigarette Trafficking Act), 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956 (h) (Money Laundering Conspiracy) and to search Ali's business e-mail account, uswholesale@gmail.com,[1] further described in Attachment A.

[1] While there is probable cause to believe, based on the facts contained in this Affidavit, that Ali, Iqbal and Ahmad have violated 18 U.S.C. §§ 371, 1956 (a), 1957 and 5324, that Ali and Iqbal have violated 18 U.S.C. §§ 1028 and 1028A and that evidence fruits and/or instrumentalities of these offense also will be found in the uswholesale@gmail.com e-mail account, I do not seek a warrant for Ali's, Iqbal's or Ahmad's arrest based on these violation at this time.

3. As set forth below, I have probable cause to believe that Ali, Iqbal and Ahmad committed these offenses and that the uswholesale@gmail.com e-mail account contains evidence and fruits and/or are instrumentalities of the offenses, as described in Attachment B.

4. Based on the e-mail address's domain name, I have probable cause to believe that the uswholesale@gmail.com account and relevant data are maintained by Google which, a government database indicates, accepts service of process at:

Google
1600 Amphitheatre Parkway
Mountain View, CA 94043

5. I base this affidavit on my personal knowledge, training and experience, and information that I have received as a result of my own participation in this investigation, including review of documents and information furnished to me by other IRS employees, and by other federal, state, and local law enforcement officers during the course of this investigation. I submit this affidavit for the limited purpose of establishing probable cause to issue warrants to arrest Ali, Iqbal and Ahmad and to search Ali's uswholesale@gmail.com e-mail account. Accordingly, this affidavit does not contain all facts known to me regarding this investigation.

## INTRODUCTION

Relevant Federal and State Tobacco Tax Laws

6. The investigation in which these warrants are sought is grounded in federal and state tobacco tax laws. The amount of tax imposed on smokeless tobaccos (such as snuff and chewing tobacco) and cigars varies significantly from state to state. Most states do not require these products to have identifying tax stamps when they are sold. Accordingly, if one purchases and takes delivery of smokeless tobacco and cigars in a lower or no-tax state and covertly

transports them to and sells them in a high-tax state, one can sell them at a substantial discount compared to tax-law-abiding competitors, while still making an outsized profit.

The PACT Act

7. Forty-nine of the 50 states in the United States impose some tax on the sale of smokeless tobacco. Pennsylvania is the only state that does not impose any excise tax on smokeless tobacco. The tax rate, and exact timing and method of collection, vary from state to state, but the liability for these state excise taxes generally arises once the smokeless tobacco enters the jurisdiction of the state. In Massachusetts, as well as other states, wholesale distributors of smokeless tobacco are responsible for reporting to their state governments the amount of the smokeless tobacco that they have imported, and for then remitting the appropriate state tax.

8. The Jenkins Act, amended by the Prevent All Cigarette Trafficking Act (the "PACT Act"), *see* 15 U.S.C. § 375, addresses the interstate shipment of tobacco products. The statute requires anyone who sells, transfers or ships for profit smokeless tobacco in interstate commerce to register with the Attorney General and with the tobacco tax administrators of any State into which they sell or ship smokeless tobacco and provide detailed information regarding their business operation. 15 U.S.C § 376 (a) (1). Smokeless tobacco means any finely cut, ground, powdered or leaf tobacco that is intended to be placed in the oral or nasal cavity or otherwise consumed without being combusted, such as chewing tobacco or snuff. *See* PACT Act definition, 15 U.S.C § 375 (12).

9. The PACT Act requires that any seller who is shipping smokeless tobacco into a state such as Massachusetts, to a person who is not properly registered with the state tax-collection agency to remit smokeless tobacco excise tax, must ensure that all applicable excise

taxes are paid on the smokeless tobacco. 15 U.S.C. § 376a (a) (3). Additionally, the PACT Act requires that any person who ships smokeless tobacco into a State must file a monthly report with the State taxing authority indicating the name and address of all persons to whom they shipped smokeless tobacco. 15 U.S.C. § 376 (a) (2).

The CCTA

10. The Contraband Cigarette Trafficking Act (CCTA), 18 U.S.C. § 2342 et. seq., makes it unlawful to knowingly ship, transport, possess, sell or distribute contraband smokeless tobacco or contraband cigarettes. 18 U.S.C. § 2341(7) defines "contraband smokeless tobacco," in relevant part, as more than 500 consumer-sized packages (or tins) of smokeless tobacco, on which state taxes have not been properly paid or with which required state regulatory or licensing requirements have not been complied.

11. Cigars, unlike smokeless tobacco, are not regulated by either the CCTA or the PACT Act. It is nonetheless illegal under the wire fraud statute, 18 U.S.C. § 1343, to use wires in interstate commerce to execute a scheme to defraud a state of any amount of excise tax that the state is owed for cigars or smokeless tobacco.

Relevant State Tobacco Statutes and Regulations

12. In Massachusetts, wholesale distributers of tobacco and cigars, which are collectively known as Other Tobacco Products, or "OTP," must be licensed by the Department of Revenue. Cigars/smoking tobacco and smokeless tobacco each have their own licensing requirement; cigars/smoking tobacco are separately codified, and the licensure for smokeless tobacco falls under the licensure for wholesaling and/or stamping cigarettes. *See*, *generally*, M.G.L. chs. 62C, 64C (setting out reporting and excise tax payment requirements).

13. An unclassified acquirer (broadly speaking, someone who obtains tobacco products from some place other than a manufacturer or a Massachusetts licensed wholesaler) becomes obligated to pay excise tax when he acquires or imports into Massachusetts. OTP distributors are required to pay the excise taxes at the wholesale level (as opposed to collecting the sales tax at the retail level, as is done with most products). A legitimate smokeless tobacco distributor must report the importation or acquisition of smokeless tobacco to the Department of Revenue on a monthly basis, by filing an excise tax return known as the form CTS-8C (or CTS-8B, previously). Cigar distributers are required to file quarterly rather than monthly reports on a form called the Cigar-2. Massachusetts imposes a 210% excise tax on the wholesale price of smokeless tobacco and a 40% excise tax on the wholesale price of cigars.

14. During the course of my investigation, I have consulted with investigators from the Pennsylvania Department of Revenue, Bureau of Tax Investigations. I have learned that Pennsylvania categorizes OTP into three separate categories: smokeless tobacco, cigars and "little cigars", which are generally described as cigars which when taken in a group weigh less than four pounds per thousand.

15. Pennsylvania does not require any licensure of smokeless tobacco and cigar wholesalers. While "little cigars" are taxed at the same rate as cigarettes, Pennsylvania does not require the collection or remittance of any excise tax on the sale of smokeless tobacco and cigars.

Money Laundering Conspiracy

16. 18 U.S.C. § 1956 (h), as material to this Affidavit, makes it unlawful to conspire to violate Section 1956 or 1957. It is thus unlawful to conspire either (a) to conduct a financial transaction involving the proceeds of a specified unlawful activity ("SUA," here, wire fraud and/or a violation of the CCTA), knowing the property involved in the transaction represents the proceeds of some form of unlawful activity, with the intent to promote the carrying-on of the SUA or (b) to engage in monetary transactions greater than $10,000 in criminally-derived property, when such property, in fact, is derived from specified unlawful activity. Trafficking in contraband smokeless tobacco in violation of the CCTA and wire fraud both constitute "racketeering activity" under 18. U.S.C. § 1961 (1), and thus are specified unlawful activities under 18 U.S.C. § 1956 (c)(7).

General Overview of the Scheme

17. Pick N Dip supplies convenience, liquor and other stores in and around Massachusetts.[2] People actively involved in Pick N Dip's supply chain -- Raza Ali, Muhammad Saleem Iqbal, and, over extended periods, Kaleem Ahmad -- have orchestrated the purchase of OTP (cigars, loose smoking tobacco and smokeless tobacco) in the low tax/no tax state of Pennsylvania, and covertly transported to and sold OTP in the high tax state of Massachusetts.

18. Ali and Iqbal have obtained much of the OTP they have sold through a shell company-- SM Wholesale and SMM Wholesale, which Ali and Iqbal also run. They have purchased substantial quantities from RDK Distributors and MV Distributors ("RDK/MV") in Stroudsburg, Pennsylvania, among others.

[2] Based on information developed to date in the investigation, Pick N Dip may also supply stores in conjunction with MSI Distributors dba Come N Go, 51 Morgan Street, Norwood, MA.

19. None of the individuals or entities has made requisite filings or paid substantial requisite taxes in Massachusetts, in violation of the CCTA, PACT Act and Wire Fraud Statutes.

20. Ahmad and others under the direction and in the employ of Ali and Iqbal have agreed to take and knowingly taken many tens of thousands of dollars in cash at a time from the sale of untaxed tobacco products in Massachusetts to purchase more cigars and other untaxed tobacco products in Pennsylvania, in violation of 18 U.S.C. § 1956 (h). They also have agreed to conduct and have knowingly conducted financial transactions involving the proceeds of specified unlawful activity--violations of the CCTA and wire fraud statutes--knowing the property involved in the transactions represented the proceeds of some form of unlawful activity and intending to promote the unlawful tobacco business of which they were a part, in violation of 18 U.S.C. 1956 (h).

## PROBABLE CAUSE

Neither Pick N Dip nor SM Wholesale is Licensed to Sell OTP in Massachusetts

21. According to licensing information maintained by the Massachusetts Department of Revenue ("DOR"), neither Pick N Dip, SM Wholesale, SMM Wholesale nor their owner of record, Salman Mahmood,[3] has a cigarette wholesaler license, unclassified acquirer license or smokeless tobacco license. Additionally, none of these four has filed a CTS-8B, CTS-8C or Cigar-2 tax form. State licensing records do not have any business licensed to sell tobacco located at 1420 Boston Providence Turnpike, Norwood, MA (Pick N Dip's office address).

---

[3] The name Salman Mahmood ("Mahmood") is associated with many of the scheme's bank accounts, physical locations and businesses. Ali has told investigators that he purchased the use of the name and personal identifiers from an individual who has since left the country and died in Pakistan. *See* paragraph 28. There is a record of Salman Mahmood's entry into the United States October 15, 2000 on a Great Britain passport with a 90-day visa waiver and no record of his departure.

There are minor differences and spellings of his name in the applications and records to which I refer in this affidavit. For clarity, his name is uniformly spelled "Salman Mahmood" herein.

22. According to records maintained by DOR, Salman Mahmood registered Pick N Dip as being subject to sales/use tax and cigarette/tobacco (Cigar-2) tax. In the fourth quarter of 2010, DOR assessed Salman Mahmood $400 for cigars/smoking tobacco. DOR made this assessment in the absence of any of the required documentation of the size of his tobacco business. DOR sent notices to Salman Mahmood in this and in subsequent quarters with instructions to pay as well as instructions to correct or appeal the assessment. No appeals were filed with Massachusetts Department of Revenue. Only three out of fifteen of the assessments of cigarette/tobacco tax were paid by Pick N Dip.

Seizures and Interviews

Seizures

23. On November 18, 2015, law enforcement agents executed court-authorized search warrants at, among other locations, Pick N Dip's warehouse at 661 Pleasant Street, Norwood and the warehouse used by Pick N Dip and MSI Distributors ("MSI") at 51 Morgan Street, Norwood.[4] Approximately 203 pallets and containers[5] of tobacco products, which Raza Ali estimated were worth approximately $2 million dollars or more, and over $100,000 in cash were seized at 661 Pleasant Street, and approximately five more pallets of tobacco products were seized at 51 Morgan Street.

[4] Law enforcement agents executed a court-authorized search warrant at RDK Distributors at this time, as well.

[5] Pallets contained varying amounts of tobacco products.

Interviews

24. While executing the search warrants, law enforcement officers began a series of interviews that continued over the next several days. These included interviews of Raza Ali on November 18 and December 3 and Kaleem Ahmad on November 18 and December 4, parts of which are summarized below.

Raza Ali

25. Ali stated that his business partner has always been Muhammad Saleem Iqbal, and that he and Iqbal are childhood friends from Lahore, Pakistan. According to Ali, they were introduced into the business of selling untaxed tobacco from Pennsylvania by M. J.[6] To finance their business, Iqbal sold his convenience store and together Ali and Iqbal purchased a substantial amount of untaxed tobacco.

26. Ali admitted that he sold tobacco products to stores in Massachusetts without paying Massachusetts taxes. Ali explained that his business had grown to service in excess of 125 area convenience stores, almost all of which paid in cash.

27. Ali stated that he was responsible for the handling and preparation of tobacco orders at 661 Pleasant Street and that he also coordinated sending completed tobacco orders to 51 Morgan Drive where Iqbal ran the day-to-day operations. Ali stated that money generated by the business was used by Iqbal and him to pay overhead and to reinvest in more tobacco and other products.

28. According to Ali, to conceal their involvement in the tobacco business, Ali and Iqbal purchased the identity of Salman Mahmood for $7,000 and started the business of Pick N Dip. This was done to list Salman Mahmood on any necessary business certificates while

[6] Initials are used here and in paragraph 42, below, to protect the identities of the individuals.

concealing Ali and Iqbal as the true owners. Mahmood also opened the Bank of America account that Ali used originally to conduct Pick N Dip's business. Ali said Mahmood later died in a motorcycle accident in Pakistan.

29. Ali said the business known as MSI was also a partnership between Iqbal and him.

30. Ali said that Kaleem Ahmad had a more limited role than Iqbal and he did in the business of selling untaxed tobacco.[7] Ali said Ahmad became involved in the business of selling untaxed tobacco over the last year.

31. Ali admitted that he had given the Pick N Dip drivers going to Pennsylvania large lump sums of cash (many tens of thousands of dollars at a time) to purchase tobacco products. In addition, Ali made out deposit slips to the business account of SMM Wholesale at Wells Fargo Bank in amounts between $7,000 and $9,000 and had Pick N Dip drivers make cash deposits to the account.[8] Ali knew the bank reporting requirements were $10,000, so he purposely structured the deposits to be below that amount so that the drivers would not be required to fill out any paper work or show any photo identification. Ali instructed the drivers to make the deposits at different branches as well. Ali admitted that SM Wholesale and SMM

---

[7] On a separate occasion he described Ahmad as having very little to do with the tobacco. While the investigation to date indicates Ahmad played a lesser role than Ali or Iqbal, the facts contained in this affidavit reflect diverse and material involvement in the charged criminal violations by Ahmad. *See, e.g.,* paragraphs 30, 34-38, and 57-59.

[8] An account ending x6436, in the name of SMM Wholesale with an address of 120 Victory Drive, Milford, PA, was opened at Wells Fargo, in November 2013. The sole signer on the signature card was Salman Mahmood. An analysis of deposits from November 2013 through June 2014 has 156 deposits with cash. The average deposit amount was approximately $8,500. A spot check of the deposits since June 2014 reflects the same type of activity involving cash deposits less than $10,000.

The deposits into these accounts appear to have been structured to avoid reporting requirements. The amounts deposited were often very close to, but below, the $10,000 reporting requirement and there were a number of occasions in which there were multiple cash deposits on the same day totaling over $10,000. Most of the checks drawn on this these accounts appeared to go to tobacco wholesalers located in Pennsylvania.

Wholesale were set up to help hide the ultimate destination of tobacco products purchased in Pennsylvania. He also stated that that both Iqbal and he intentionally made bank deposits of less than $10,000 so that the deposits would not trigger any reporting requirements or any request for identification.

32. Ali admitted that he and Iqbal made regular purchases of tobacco products from RDK/MV in Pennsylvania.[9] RDK/MV was paid in a mixture of cash and checks. RDK/MV used a system of multiple invoices to divide orders so that they appeared as multiple orders of less than $10,000 each, rather than one order many times that amount.[10]

33. Ali explained that he usually called RDK on Mondays and placed orders for "priority" tobacco products such as "Skoal" and "Kodiak". Other tobacco products would be ordered from RDK by Ali's cousin, using Ali's uswholesale@gmail.com business e-mail account. Ali provided the password to the uswholesale@gmail.com account.

Kaleem Ahmad

34. Ahmad admitted accompanying Ali several times to purchase tobacco, and that this involved delivering cash and picking up tobacco. Ahmad also admitted travelling to Pennsylvania himself to deliver cash and pick up tobacco. He said that when he went, he took between fifty and eighty thousand dollars per trip to pay for tobacco products.

35. Ahmad stated that Pick N Dip was buying tobacco cheaper in Pennsylvania because it didn't pay tax on it there and that Iqbal and Raza Ali both knew that they were not

---

[9] Ali stated in an interview that RDK, R R and MV Distributors were names used by the same people. In this affidavit, they will be referred to in common as RDK/MV.

[10] The law requires that trades and businesses report cash payments of more than $10,000 to the federal government by filing IRS/FinCEN Form 8300, *Report of Cash Payments Over $10,000 Received in a Trade or Business*.

paying taxes on tobacco that they purchased there.[11] Ahmad understood that these purchases and the payment in cash were to avoid paying taxes.

36. Ahmad admitted that Ali had asked him to make bank deposits. Ahmad said that he had intentionally structured the bank deposits to avoid the suspicion of the bank. Ahmad stated that Ali instructed him to avoid large deposits because the bank would then close the bank accounts.

37. Ahmad also stated that he had worked at 51 Morgan Street for approximately the past year-and-a-half. Among other things, he would take customers' orders which often included both tobacco and non-tobacco products. He said the tobacco products were primarily kept at 661 Pleasant Street and he often would coordinate getting the tobacco part of the order from there. He said that many customers picked up and paid for their orders in a nearby store parking lot to avoid potentially being seen by law enforcement.

38. Ahmad admitted to owning a smoke shop for a period of time. According to Ahmad, he got tobacco from Pick N Dip and sold it through his store. Ahmad admitted that he understood the tax and price difference of tobacco purchased in Pennsylvania and Massachusetts. Ahmad stated that he also purchased some tobacco from a legitimate wholesaler to provide a cover for the untaxed tobacco he was purchasing from Iqbal and Ali.

[11] Ahmad at a different point contradictorily stated during his first interview that Iqbal had no part in the tax-free tobacco business of Pick N Dip.

Independent Records, Reports and Surveillance

39. Independent records and reports and surveillance conducted during the course of the investigation are consistent with these descriptions of Ali's, Iqbal's and Ahmad's tobacco tax evasion and money laundering.

Independent Records and Reports Evidencing Ali's and Iqbal's Partnership and Their Use of Mahmood's Name to Run SM Wholesale and Pick N Dip

40. According to a 2011 Federal Income Tax return and three bank applications filed in his name, among other records, the owner of Pick N Dip is Salman Mahmood. Pennsylvania state records reflect that Salman Mahmood incorporated SM Wholesale Inc. on September 6, 2012 and SMM Wholesale Inc. on January 28, 2013, both with an address of 120 Victory Drive, Milford, PA.

41. In September 2012, an individual using the name Salman Mahmood applied for a Pennsylvania cigarette dealer's license in the name of SM Wholesale Inc. at that address. A Pennsylvania investigator went to 120 Victory Drive, Milford, PA to follow up on the license application. While at the location the investigator saw an individual, who did not provide an ID, driving a minivan registered to Raza Ali. The investigator made a phone call to a person he was told was the owner, who said his name was "Jerry" Iqbal. Iqbal informed the investigator that while he was running the business, Salman Mahmood was the owner. Furthermore, Iqbal said SM Wholesale was selling other tobacco products to New Hampshire, Connecticut and Massachusetts. Based on the facts and events set forth herein, I believe the individual who identified himself as Jerry Iqbal was Muhammad Iqbal.

42. On March 3, 2014, R. F. was arrested in New Jersey. When he was arrested, he had a box with more than $50,000 in cash and money orders in his car. During an interview with law enforcement officers, he stated that he worked for SMM Wholesale at 1420 Boston

Providence Highway, Norwood, MA (Pick N Dip's address). Telephone records reflect that phones associated with both Ali and Iqbal called R. F. one or more times following his arrest.

43. Records from Bank of America show an account was held from July 2010 until April 2014 by "Salman Mahmood" in the name "Pick N Dip" located at 1420 Boston Providence Turnpike, Suite 117, Norwood, MA. When an agent went into 1420 Boston Providence Turnpike, the directory inside listed Keenah Distributors as occupying Suite 117. However, the name plate on the door to Suite 117, in fact, read "Pick N Dip" rather than Keenah Distributors. Massachusetts corporate records list Raza Ali as the president, treasurer, secretary and director of Keenah Distributors, Inc. and Muhammad S. Iqbal is its registered agent.

44. According to information from J. Polep Distributors, which distributes tobacco products, Raza Ali and a phone number known to be in service to Pick N Dip were the points of contact in their system. Muhammad Iqbal declared on his United States Passport application that he is a manager at Pick N Dip.

Physical and Electronic Surveillance of Transportation of OTP To and From the 661 Pleasant Street and 51 Morgan Drive Warehouses in Norwood

45. A Freightliner Sprinter van was observed repeatedly loading and unloading boxes marked as containing tobacco products at 51 Morgan Drive and 661 Pleasant Street ("the Norwood warehouses") on numerous occasions.

46. For example, on September 30, 2015, physical surveillance showed the Freightliner Sprinter being loaded with tobacco items via a pallet at 661 Pleasant Street. Multiple tobacco products were also seen inside of the Pick N Dip warehouse at 661 Pleasant Street. Shortly after departing 661 Pleasant Street the Freightliner Sprinter drove to 51 Morgan where several boxes were transferred into 51 Morgan. After departure, GPS surveillance was used to track the vehicle to 1052 South Main Street, Bellingham, MA where at a BP Gas Station

tobacco products were seen being transferred inside of the BP convenience store. A cash transaction was observed inside of the BP convenience store with the store clerk paying the Freightliner Sprinter driver. During the transaction, the BP store clerk asked if $500 was the correct price and then handed the unknown driver a stack of what appeared to be $20 bills presumably for the boxes of tobacco product which had just been carried into the store.

47. The Freightliner Sprinter also repeatedly (a) was observed near SM Wholesale's and SMM Wholesale's warehouse location at 120 Victory Drive in Milford, PA and then approximately twelve hours later at the Norwood warehouses and (b) was tracked using a Court-authorized GPS device travelling between RDK/MV Distributors' warehouse at 1410 Spruce Street in Stroudsburg, PA[12] and the Norwood warehouses.

48. For example at 3:15 p.m. on May 29, 2015, a vehicle matching the appearance of the Freightliner Sprinter was observed leaving Victory Drive in Milford, PA, where SM and SMM Wholesale are located. The same transport vehicle was subsequently seen that evening at approximately 9:00 p.m. outside 51 Morgan Drive, Norwood, MA and at approximately 8:30 a.m. the next morning unloading boxes at 661 Pleasant Street, Norwood, MA.

49. On the morning of July 21, 2015, the GPS tracking device evidenced the Freightliner Sprinter stopping both in the vicinity of SM Wholesale's warehouse location at 120 Victory Drive in Milford, PA, and in the vicinity of RDK/MV's warehouse at 1410 Spruce Street, Stroudsburg, PA. The GPS tracking device then evidenced the Freightliner Sprinter stopping early the next morning at Pick N Dip's warehouse location at 661 Pleasant Street in Norwood, MA.

---

[12] In an earlier affidavit in support of tracking warrants in this investigation, I stated that GPS data showed the Freightliner Sprinter in the vicinity of 1306 Spruce Street based on the number provided by an Internet mapping program. An investigator from the Pennsylvania Department of Revenue has driven to the site and determined that it is 1410 Spruce Street, the address of RDK Distributors.

50. On September 24, 2015, the GPS tracking device evidenced the Freightliner Sprinter departing 51 Morgan Drive at 5:26 p.m. With an overnight stop, it drove to Spruce Street where it arrived at 2:37 p.m. It remained there for one hour and six minutes and departed at 3:43 p.m. After another overnight stop en route, it returned on September 26, 2015 to 51 Morgan Drive where it arrived at 9:36 a.m. After staying two hours and 26 minutes it moved to 661 Pleasant Street.

51. On October 27, 2015, the GPS tracking device evidenced the Freightliner Sprinter departing 51 Morgan Drive at 3:48 a.m. With a few rest stops, it drove directly to 1410 Spruce Street where it arrived at 2:20 p.m. Agents there observed the vehicle at a loading dock. At 3:25 p.m. the vehicle departed and returned to 51 Morgan Drive where it arrived at 9:15 p.m.

Records of SM and SMM Wholesale Purchasing Significant Quantities of OTP Over Time From JN and RDK/MV

52. Management Science Associates ("MSA") receives self-reporting data from enrolled tobacco wholesalers. The data shows the combination of shipper and receiver of tobacco, weekly net volumes shipped, and item brand level showing manufacturer and brand family. Because the data set contains only self-reported sales of enrolled tobacco wholesalers, it does not necessarily contain all sales by every tobacco wholesaler.

53. MSA records reflect that RDK Distributors reported selling approximately 207 unique packages of cigars and smokeless tobacco, for a total of approximately 2,596,595 units, to SM Wholesale between February 2, 2013 and August 16, 2014. During the first MSA reported week of February 2, 2013, alone, RDK reported selling SM Wholesale 22,680 consumer size units of various Skoal products and 4,500 consumer-size units of Kodiak.

Records of Millions of Dollars of Payments to RDK and MV Distributors Out of Both Pick N Dip and SM Wholesale Accounts

54. There were over $6,000,000 in checks from Pick N Dip and SMM Wholesale to MV Distributors and RDK Distributors between March 2013 and July 2015.

Records and Surveillance of Banking by Ali in Salman Mahmood's Name

55. A Wells Fargo account in the name SMM Wholesale Inc. over which "Salman Mahmood" has authority is set up for online banking. It was accessed over 40 times between December 6, 2014 and September 11, 2015, through a Verizon IP address assigned to 13 Warmstone Way, Hopkinton, MA. That is the home address of Raza Ali, according to his Massachusetts Driver's License.

56. On or about May 12, 2015, Ali was observed on camera opening an account for Pick N Dip at an Eastern Bank branch located in Taunton, MA. He presented an image of Salman Mahmood's identification card, to identify the individual on whose behalf he was ostensibly opening the account.

Surveillance of Ahmad's Cash Deposits in Pick N Dips Bank Accounts

57. In or about April 2014, another bank account was opened for Pick N Dip at Santander Bank using Salman Mahmood's personal identifying information. Checks from this account then went to RDK/MV Distributors. On January 28, 2015, a surveillance camera captured Ahmad at the Norwood branch of Santander Bank depositing $9,482 in cash (just less than the $10,000 reporting requirement trigger-point) into Pick N Dip's account.

58. The Sharon branch of Eastern Bank, where a bank account was opened for Pick N Dip in May 2015, is located at 7 South Main Street, Sharon, MA. This is 4.2 miles from 34 Knob Hill Street, the residence of Kaleem Ahmad, who identified himself as Iqbal's brother on his passport application. It is on the route that Kaleem Ahmad has been observed driving to the

Norwood Warehouses in the morning. On surveillances of 34 Knob Hill Street, Sharon, MA, Kaleem Ahmad has been observed leaving his residence between 8:50 a.m. and 9:10 a.m. and arriving at the Norwood warehouses between 9:10 a.m. and 9:40 a.m. Bank surveillance photos taken between June 16, 2015 and September 16, 2015 repeatedly evidence Ahmad making cash deposits of between approximately $1,000 and $5,000 in cash in Pick N Dip's account at the Sharon branch of Eastern Bank between 8:55 a.m. and 9:55 a.m.

Preservation of E-Mail Account

59. Based on my training and experience, I know that e-mail service providers, including Google, often allow account holders to store opened and unopened e-mails for years on their servers, sometimes subject to a maximum size limit.

60. On December 2, 2015, Assistant U.S. Attorney Stephen Heymann sent a letter to Google requesting under 18 U.S.C. § 2703(f) that the company preserve records associated with uswholesale@gmail.com for 90 days.

***LEGAL AUTHORITY***

61. The government may obtain both electronic communications and subscriber information from an e-mail provider by obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

62. Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting company or e-mail provider whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

63. If the government obtains a search warrant, there is no requirement that either the

government or the provider give notice to the subscriber. 18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

***FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT***

64. Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to execute a search warrant for electronic evidence within 14 days (formerly 10 days) of the warrant's issuance. If the Court issues this warrant, the United States will execute it not by entering the premises of Google, as with a conventional warrant, but rather by serving a copy of the warrant on the company and awaiting its production of the requested data. This practice is approved in 18 U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

65. Based on my training and experience and that of other law enforcement, I understand that e-mail providers sometimes produce data in response to a search warrant outside the 14-day period set forth in Rule 41 for execution of a warrant. I also understand that e-mail providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

66. The United States does not ask for this extra data or participate in its production.

67. Should Google produce late-created data in response to this warrant, I request permission to view all late-created data that was created by Google, including subscriber, IP address, logging, and other transactional data, without a further order of the Court. This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit. However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-

holder(s), such as e-mail, absent a follow-up warrant.

68. For these reasons, I request that the Court approve the procedures in Google Attachment B, which set forth these limitations.

## CONCLUSION

69. There is probable cause, based on the information set forth above, that Raza Ali, Muhammad Saleem Iqbal, and Kaleem Ahmad, have committed violations of 18 U.S.C. § 1956 and 1957 (Money Laundering), 18 U. S.C. § 5324 (Structuring), 15 U.S.C. § 376 (Jenkins Act/PACT Act), 18 U.S.C. § 2342 (Contraband Cigarette Trafficking Act), 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 371 (conspiracy), and that Raza Ali and Muhammad Saleem Iqbal have committed violations of 18 U.S.C. § 1028 (Identity Theft) and 18 U.S.C. § 1028A (Aggravated Identity Theft). Further, based on the information set forth above, there is probable cause to believe that evidence, fruits, and instrumentalities of these crimes described in Attachment B will be obtained by searching the e-mail account described in Attachment A.

70. I request that the Court issue warrants authorizing the arrest of Ali, Iqbal and Ahmad for violation of 15 U.S.C. § 376 (Jenkins Act/PACT Act), 18 U.S.C. § 2342 (Contraband Cigarette Trafficking Act), 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956 (h) (Money Laundering Conspiracy) and authorizing members of the Internal Revenue Service, Federal Bureau of Investigation, and Department of State or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above described investigation, to search the e-mail account described in Attachment A for the things to be searched described in Attachment B.

Sworn to under the pains and penalties of perjury.

Daniel J. Fornash
Special Agent
Internal Revenue Service, Criminal
Investigation

Subscribed and sworn to before me this 16 day of December, 2015.

JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE